[Crim. No. 17661. First Dist., Div. Two. Jan. 31, 1979.]

THE PEOPLE, Plaintiff and Appellant, v.
JOHN MICHAEL WHYTE, Defendant and Respondent.

## COUNSEL

Evelle J. Younger, George Deukmejian, Attorneys General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, William D. Stein, Robert R. Granucci and Linda Ludlow, Deputy Attorneys General, for Plaintiff and Appellant.

Michael Stepanian and Steffan Imhoff for Defendant and Respondent.

## OPINION

**MILLER, J.**—The People appeal from an order of Marin County Superior Court granting a motion to suppress and dismissing an information for the import and transport of hashish in the State of California in violation of section 11360, subdivision (a), of the Health and Safety Code.

Uncontroverted evidence produced at a preliminary examination and made part of the record at the hearing de novo revealed that on April 9, 1977, Douglas Ross, a United States Customs agent, was working with a specially trained dog at the foreign import section of the San Francisco Airport cargo shed when the dog began scratching at six large bales of burlap. Ross notified Inspector Kaufman and they opened one bale. They found approximately 30 ounces of hashish in a laminated board in the center of the bale. All bales were taken to the customs office for security.

The shipping document for the burlap indicated that the shipper was "John Michael Whyte, c/o the Taj Mahal Hotel, Bombay India," and the recipient was "John Michael Whyte, c/o the Asiatic Galleries, 335 San Anselmo Avenue, San Anselmo, California." Respondent rented space at the San Anselmo address.

On April 12, 1977, respondent contacted the Frank Dow Brokerage Company and requested that the shipment be delivered by Bolan Trucking Company on the following day, April 13, 1977.

Agent Clinton Cook of the Drug Enforcement Administration (hereinafter DEA) of the United States Department of Justice was contacted by customs and assigned to accompany the truck and help deliver the bales. No search warrant was issued or applied for. Cook believed no warrant

was necessary, since the bales were being delivered to a book store, and not a residence. He arrived at the Abraxas Book Store, 335 San Anselmo Avenue, in San Anselmo, at 11:30 a.m., and contacted the clerk, Carla Cunningham, regarding the bales.

Ms. Cunningham had been telephoned by respondent approximately a week previously. He told her some "art goods" would be delivered and that she should accept them when they came. On April 13, 1977, respondent came into the store and told Ms. Cunningham that the "art goods" would arrive that day. She was instructed to give the delivery persons a check which he left. He then said to put the bales, which would be big, in front of the store, and that he would pick them up later.

When Agent Cook notified Ms. Cunningham that the goods had arrived, she gave him a certified check for $268.38. Ms. Cunningham told Cook that respondent had given her the check for payment of the goods and instructed Cook to put the six bales on the sidewalk outside the store, which he did. About an hour after Cook and the other deliverymen left, respondent came into the store and told Ms. Cunningham that he needed to get a truck to pick up the bales. About 4:30 p.m., respondent called Ms. Cunningham and said he did not yet have the truck, that she should close the store and he would pick up the bales later.

At about 5:45 p.m., another clerk in the store said that the bales shouldn't be left outside as they were "expensive." He proceeded to drag the bales into the store. Federal agents, assisted by San Anselmo police, came in and arrested Ms. Cunningham. The bales were put back outside in front of the store.

Throughout the day, federal agents and local police had kept the store under surveillance. At about 1:20 p.m., respondent was observed entering the store and then leaving after a few minutes. Later, he was observed sitting in a vehicle near the post office about 200 yards from and facing the book store. Respondent was later seen driving past the book store.

Agents continued the surveillance until 11:15 p.m., at which time they took the bales into custody at the San Anselmo police station. There were 43 pounds, 10 ounces of hashish inside the bales of cloth.

Pursuant to section 1538.5 of the Penal Code, defense counsel moved to suppress the evidence on the grounds that the warrantless seizure of the bales inside respondent's office was unlawful. Counsel also moved to

set aside the information under section 995 of the Penal Code based on the grounds that (1) the offense was not committed in the County of Marin iand (2) the state importation statute was preempted by federal importation statutes. Relying on *United States* v. *Chadwick* (1977) 433 U.S. 1 [53 L.Ed.2d 538, 97 S.Ct. 2476], the trial court granted both motions.

The People contend that the evidence was properly searched and seized and the court erred in suppressing evidence on the basis of *Chadwick*.

■ Before proceeding to the merits of the People's argument, we must first consider respondent's contention that the search warrant issue is not properly before this court. The People appeal from the granting of the motion to set aside the information pursuant to section 995 of the Penal Code. However, the issues raised by appellant concern the validity of the warrantless search which was the basis for granting the motion to suppress pursuant to section 1538.5 of the Penal Code. Respondent contends that the trial court dismissed the information under section 995 of the Penal Code, which was supported by separate and independent grounds. We disagree.

The sole grounds stated by the trial court for granting both the sections 995 and 1538.5 motions was "the compulsion of *United States* v. *Chadwick*." While respondent's section 995 motion may have been based on jurisdiction and/or preemption arguments, it is evident that the court set aside the information on a different theory; namely, that the evidence supporting the information was obtained illegally.

When the only substantial evidence supporting the commitment has been obtained in violation of the Fourth Amendment, a defendant is held to answer without reasonable or probable cause within the meaning of section 995 of the Penal Code. (*People* v. *Scoma* (1969) 71 Cal.2d 332, 335 [78 Cal.Rptr. 491, 455 P.2d 419].)

Respondent cites *People* v. *Minervini* (1971) 20 Cal.App.3d 832, 836 [98 Cal.Rptr. 107] for the proposition that if the trial court undertakes to dismiss an information contemporaneously with the granting of a motion to suppress, such action should be taken under Penal Code section 1358, rather than section 995, to permit an orderly review on appeal. (See Pen. Code, § 1238, subd. (a)(7).)

However, "Section 1538.5 of the Penal Code, which deals in general with motions to suppress as evidence property obtained in violation of the Fourth Amendment, provides in subdivision (n) that 'Nothing in this section shall be construed as altering . . . (v) the procedure and law relating to a motion made pursuant to Section 995 or the procedures which may be initiated after the granting or denial of such a motion.' It therefore appears that section 995 remains a proper remedy when the evidence alleged to have been obtained through illegal means is the only substantial evidence supporting the commitment." (*People* v. *Scoma, supra,* at p. 335, fn. 2.)

In *Minervini,* as in the instant action, respondents moved to suppress evidence and to set aside the information pursuant to sections 1538.5 and 995 of the Penal Code. After discussing the consternation that results from the making of simultaneous, undifferentiated orders suppressing evidence and setting aside an information, the court concluded that where the defendants have successfully contended that the evidence should be suppressed because of its incompetency under the Fourth Amendment and also have successfully argued that the evidence before the judge was inadequate, the appropriate appellate procedure is to entertain an appeal from the order setting aside the information and treat the dismissal as having stemmed from the suppression order. (*People* v. *Minervini, supra,* at p. 836.)

Therefore, it is our conclusion that an order to set aside an information pursuant to section 995 of the Penal Code may be based on a determination that evidence to support the information was illegally searched and seized. (Cf. *People* v. *Superior Court (Kusano)* (1969) 276 Cal.App.2d 581, 586, fn. 4 [81 Cal.Rptr. 42].) Accordingly, the grounds for granting the motion to suppress are reviewable on appeal from the granting of the section 995 motion.

■ Respondent next contends that since prior to this appeal appellant never put forth the theory that the instant search was a customs search, the issue is not properly before this court. This contention must also be rejected.

At the preliminary examination, the prosecution principally contended that a warrant was not needed because it was a business and not a residence. In its response to respondent's motion to suppress, the prosecution argued that the search was incident to the arrest of Ms. Cunningham. However, at the time of the preliminary examination, the

prosecutor, during his final argument, asked the court to take into consideration the agent's area involving customs. He argued that customs agents need not show probable cause before searching evidence coming through international trade and that the customs agent is in constructive possession of the evidence up until the time of delivery. While it is preferable for the prosecution to set forth its justification for a warrantless search and/or seizure in its response to the defendant's motion to suppress evidence, the People's theory or justification can be determined from the evidence and argument offered. (*People* v. *Manning* (1973) 33 Cal.App.3d 586, 601 [109 Cal.Rptr. 531].) Since, in the present case, the preliminary examination transcript was made part of respondent's motion to suppress, appellant is not precluded from raising this issue on appeal.

■ Appellant's single contention on appeal is that the subject warrantless search and seizure of the evidence in San Anselmo was proper, since the search was undertaken by United States Customs officials acting under the aegis of 19 United States Code section 482.[1] The People argue that no warrant is necessary in cases where customs officials search pursuant to their powers under this and related sections.[2]

The People cite *United States* v. *King* (5th Cir. 1975) 517 F.2d 350 for the proposition that items still in transit properly can be searched and seized by customs officials, and *Chapman* v. *United States* (10th Cir. 1971) 443 F.2d 917 and *United States* v. *Davis* (7th Cir. 1959) 272 F.2d 149 for the proposition that it is proper for customs agents to arrange for a "controlled delivery" where there is contraband discovered in imported articles. Consequently, they conclude that it was proper for customs to contact the DEA to arrange for an agent to deliver the shipment and subsequently seize and search the bales of burlap. We cannot agree.

[1] 19 United States Code section 482 states: "Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, in, or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial."

[2] 19 United States Code section 1499 also authorizes examination of imported merchandise.

It is unreasonable to characterize this search and seizure as a customs search when the bales had been searched by customs four days earlier at San Francisco International Airport and the seizure was carried out by DEA and police agents at a bookstore after the goods were in the possession of federal agents for the entire four-day period prior to the "controlled delivery."

We find few "controlled delivery" cases where a court characterized the search as a customs search. In every California case, a judicially authorized warrant was obtained because the agents realized they were not carrying out a customs search. (See *People* v. *Duncan* (1974) 40 Cal.App.3d 940 [115 Cal.Rptr. 699]; *People* v. *Shapiro* (1974) 37 Cal.App.3d 1038 [113 Cal.Rptr. 54]; *People* v. *Kosoff* (1973) 34 Cal.App.3d 920 [110 Cal.Rptr. 391]; *People* v. *Sloss* (1973) 34 Cal.App.3d 74 [109 Cal.Rptr. 583]; *Weber* v. *Superior Court* (1973) 30 Cal.App.3d 810 [106 Cal.Rptr. 593]; *People* v. *Superior Court (Marcil)* (1972) 27 Cal.App.3d 404 [103 Cal.Rptr. 874]; *Alvidres* v. *Superior Court* (1970) 12 Cal.App.3d 575 [90 Cal.Rptr. 682].) Similarly, in *Chapman,* a search warrant was issued after customs searched the contraband.

Reliance on the authority of the customs service is particularly misplaced in the case at bench. Appellant asserts that the bales of burlap were still in transit to the ultimate consignee, the respondent. On the contrary, we find that the bales were delivered to respondent's place of business. While they were out on the sidewalk, under surveillance of federal agents, it conceivably could be argued that they remained in transit and under the control of the customs service. However, once the bales were placed inside of the Abraxas Book Store where respondent rented space for his business, and absent exigent circumstances, a warrantless seizure and subsequent search of the bales became unreasonable under any theory.

Clearly, they were no longer in transit or under the dominion of customs. ■ Nor, as the trial court determined, is this a case where the search was incident to a lawful arrest. Such a search could not extend beyond Ms. Cunningham or the area within her immediate reach, since the justification of this type of search is only to protect the arresting officers or prevent destruction of evidence. (*Chimel* v. *California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034].) Those concerns were not present or alleged to be present in the present case. The most probable explanation of what occurred was offered by the testimony of Agent Cook. Agent Cook neither applied for nor obtained a warrant, since he mistakenly

believed that a warrant was only necessary in cases where evidence was to be seized from a residence. The law, as articulated in *Chadwick,* and relied on by the trial court, is that the Fourth Amendment warrant clause is not limited to protection of only dwellings and other specifically designated locales. Although respondent did not actually instruct that the bales be placed in the store, once this had been done on his behalf he was entitled to protection from unreasonable government intrusion.

■　　Chadwick, however, is not necessary for a determination of this matter. As our Supreme Court stated in *People* v. *Dumas* (1973) 9 Cal.3d 871, 881-882 [109 Cal.Rptr. 304, 512 P.2d 1208]: "The pattern of prior decisions suggests that one of the most crucial determinants of the validity of warrantless searches is the nature of the place subjected to search. This pattern has been created by the interweaving of constitutional concepts with fundamental human needs and expectations. The courts have implicitly recognized that man requires some sanctuary in which his freedom to escape the intrusions of society is all but absolute. [Fn. omitted.] Such places have been held inviolate from warrantless search except in emergencies of overriding magnitude, such as pursuit of a fleeing felon (*Warden* v. *Hayden* (1967) 387 U.S. 294 . . .) or the necessity of action for the preservation of life or property (*People* v. *Roberts* (1956) 47 Cal.2d 374, 377 . . .; *People* v. *Sirhan* (1972) 7 Cal.3d 710, 735-741 . . .; cf. *Chimel* v. *California* (1969) *supra,* 395 U.S. 752.)[8]"

In that case, footnote 8 provides: "Homes and *offices* clearly fall within this category of maximum protection (*Vale* v. *Louisiana* (1970) 399 U.S. 30 . . .; *Silverman* v. *United States* (1961) 365 U.S. 505, 511-512 . . .) as do hotel rooms (*Stoner* v. *California* (1964) 376 U.S. 483 . . .; *United States* v. *Nelson* (6th Cir. 1972) 459 F.2d 884)." (Italics added.)

Once the bales of burlap were placed inside the bookstore, control by the customs service ended. In the absence of any emergency, any subsequent government intrusion without a warrant was unreasonable.

We, therefore, affirm the order granting the motion to suppress and dismissing the information.

Taylor, P. J., and Rouse, J., concurred.

A petition for a rehearing was denied March 2, 1979, and appellant's petition for a hearing by the Supreme Court was denied April 19, 1979.